## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| **In re: Norman R. Wolff**<br><br>**and**<br><br>**Judith L. Wolff,**<br><br>**Debtors.** | **Bankruptcy No.  05-B-74815**<br>**Chapter 7**<br>**Judge Manuel Barbosa** |

## MEMORANDUM OPINION

This matter comes before the Court on the Trustee's motion to compromise a legal malpractice claim.  For the reasons set forth herein, the Court will grant the Trustee's motion.

### JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

### FACTS AND BACKGROUND

The Debtors purchased approximately 140 acres of real estate in Woodstock, Illinois (the "Property") in 1996 for $1,350,000.  The Debtors financed the purchase with a $495,000 first

Page 1 of  29

mortgage from Capital Bank, a $417,000 second mortgage from Puritan Finance and a $300,000 promissory note back to the seller, and financed the rest of the purchase price with their own funds. The Property had a conifer nursery, an apple orchard, a deer park and a country store on the premises, and the Debtors' primary goal was to run a family entertainment farm on the property. The Debtors also claim that, from the beginning, they thought about subdividing the property and developing it into residential property as a "plan B" if the farm ever failed. They thought that, since the property was close to Woodstock, Harvard and Crystal Lake, it might be valuable land for residential property. However, the feasibility of developing the land in this way appears to have been based simply on the Debtors' guesses. They had no experience in developing land and had not obtained an appraisal of the land's worth for residential development or advice on the costs or benefits of developing the land. Prior to the summer of 2005, the Debtors did not take any active steps toward developing the land for residential use, such as speaking to developers about the actual potential to develop the land. The land was zoned as agricultural, and the earliest the Debtors made any inquiries about zoning or the process of rezoning the property was in 2004 or 2005.

In 1999, the Debtors refinanced the Property with a $1,650,000 first mortgage loan from Resource Bank. The Debtors made their first payment to Resource Bank, but then failed to make any subsequent payment on the mortgage. Resource Bank finally filed a complaint to foreclose on the Property in McHenry County in 2002. The Debtors failed to pay their property taxes for at least the years of 2003 and 2004, forcing Resource Bank to redeem the property taxes.

Resource Bank was also forced to pay to retain property insurance on the Property in November 2005, after it was notified that the premium had not been paid by the Debtors. A judgment of foreclosure was entered in favor of Resource Bank in June 2005 for approximately $3.29 million, constituting $1,680,000 in principal, plus accrued interest, attorney's fees and costs.

On September 14, 2005, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code with this Court. The Debtors initially filed *pro se*. On October 5, 2005, Resource Bank filed a motion to terminate the automatic stay with respect to the Property. Shortly thereafter, the Debtors retained Barrick, Switzer, Long, Balsley & Van Evera, LLP ("Barrick, Switzer") to represent them in the bankruptcy case. The Debtors initially met with James Stevens at Barrick, Switzer and explained their situation, including their plan to develop the Property into residential real estate under a Chapter 11 plan. Soon after that meeting, the Debtors called Mr. Stevens and told him they would like to retain him and his firm. Mr. Stevens informed the Debtors that he was going on vacation, but that Jason Rock from their office would appear for the firm in court until he returned. On October 26, 2005, Mr. Rock appeared in court on behalf of the Debtors and noted that the Debtors were in the process of retaining him as counsel. After court, the Debtors paid Mr. Rock a $10,000 retainer when they met with him in the courthouse. The same day, an evidentiary hearing on the motion to terminate the automatic stay was set for November 23, 2005 (the "November 2005 Hearing"). On November 15, 2005, the Court entered an order approving the Debtors' motion to employ Barrick, Switzer as attorneys for the Debtors as debtors-in-possession under 11 U.S.C. § 327. Sometime before the

November 2005 Hearing, Mr. Rock met with the Debtors on the Property, where they discussed the Property, their current operations and their plans for developing the Property. The Debtors mentioned all of the developers they had spoken with, and thought the developers would be called as witnesses at the hearing. On the day before the hearing, the Debtors met again with Mr. Rock at the offices of Barrick, Switzer, where they discussed Mt. Rock's planned presentation for the hearing, but did not prepare or review testimony.

At the November 2005 Hearing, Resource Bank called as a witness Neil Renzi, a real estate appraiser. Mr. Renzi testified that, based on a September 2004 appraisal and a November 14, 2005, reappraisal of the Property that he conducted, the Property had a total market value of $2,100,000 for the land, improvements and stock of trees. The value of the land was based on comparisons to other comparable land recently sold in the area, and took into account the possibility of development. Mr. Renzi also indicated that such value was the market value, based on having a reasonable time to market the sale, and not a liquidation or fire-sale value. The value of the improvements was determined on a cost basis. Mr. Renzi indicated that, based on his analysis, the highest and best use of the land at the time was for agricultural use. He noted that the property was currently zoned as agricultural, lacked soil and water and, because of the irregular shape of the property and the limited frontage along the main road, it would be difficult and costly to develop the land as a residential subdivision. Based on the current market and the state of development of the surrounding area, Mr. Renzi did not think residential development was feasible at that time, though he thought it might become feasible within five or more years.

The Debtors did not offer expert testimony or other evidence to rebut the appraisal and testimony of Mr. Renzi. In cross-examination, Mr. Renzi admitted that residential property in the area that was empty and ready for development could sell for $75,000 per acre, but he expressly noted that such an analysis "would be site specific and it was a specific analysis that I did not make." (Hr'g Tr. 27, Nov. 23, 2005). In other words, the Debtors' argument that the property could be worth $75,000 per acre if used for residential development was speculative, and also ignored the improvements that would be required before homes could be built, such as building roads and sewer lines, and Mr. Renzi indicated such development would be more costly than usual.

Mr. Wolff testified at the November 2005 Hearing that he began to realistically think about developing the Property into residential real estate in the summer of 2005, at which point he began to actively solicit developers. He described his plan as one in which he would find a developer that would agree to develop the Property as a joint venture. His hope was that the Debtors would simply contribute the land and the developer "would put up the capital," including posting a bond to cover all of the operating expenses, and funding all the development work of building the roads, septic systems, and electric and gas lines. (Hr'g Tr. 79, Nov. 23, 2005). In exchange, the developer would receive a 50/50 interest in any profits.    The Debtors admitted that they had no experience and would need "the help of a developer, somebody that has already done it before."  (Hr'g Tr. 90, Nov. 23, 2005). In other words, the Debtors would provide the property and the developer would provide everything else. Mr. Wolff testified that he had talked to seven developers, but admitted that he had not signed or drafted any joint

venture agreement or entered into any form of letter of intent. He stated that he "entered into a verbal agreement with ICG to provide me with free wetland surveys, roads and bridges," but did not elaborate. (Hr'g Tr. 93, Nov. 23, 2005). Presumably this was a term offered in preliminary discussions rather than an agreement in itself, and the Debtors have admitted that there was nothing in writing. But even if the promise were enforceable, it was less than an agreement to fully develop the land, and certainly was not an agreement to front all costs of that development.

The Debtors had not taken any affirmative steps towards rezoning the Property at the time of the November 2005 Hearing, other than perhaps having conversations with one or two of Mr. Wolff's associates on the subject sometime in 2004 or 2005. Mr. Wolff was not qualified and therefore was unable to testify on the process or time it would take to rezone the Property, and the Debtors presented no other testimony or evidence to establish the timeframe. Mr. Wolff was also not qualified to testify as to the value per acre that the Property would be worth if successfully redeveloped or to the costs or timeframe required to redevelop the Property, and the Debtors presented no other testimony or evidence on the subject. The Court concluded that the Debtors had no equity in the Property, and that the Debtors had not established that the Property was necessary to an effective reorganization because the Debtors had not established that their redevelopment plan had a reasonable possibility of success within a reasonable time. The Court noted that it had been nearly six months since the Debtors filed their bankruptcy petition, and that after that amount of time, the Debtors should have been able to at least present competent testimony as to the feasibility and time table for their proposed reorganization plan. The Court

therefore granted Resource Bank's motion to terminate the automatic stay, and an order was entered on December 5, 2005.

After the hearing, the Debtors' asked Mr. Rock to file an appeal and he told them they had 10 days to file the appeal. Concerned about getting the appeal filed, Mr. Wolff called Mr. Rock shortly after Thanksgiving, and was told that the motion was not finalized, but that there was still time to file. Mr. Wolff called Mr. Rock numerous times over the next few days to check on the status of the appeal, but was unable to get in contact with him. Finally, Mr. Wolff asked about Mr. Rock's schedule, and went to meet him in person at the courthouse without an appointment sometime in early December. Mr. Rock told him that there was still time left and that the appeal would cost $7,000. Mr. Wolff agreed. Still worried about getting the appeal filed, Mr. Wolff continued to call Mr. Rock's office over the next few days to check on the status, but was again unable to reach Mr. Rock directly. When several days later Mr. Wolff had still not received notice of the appeal, he finally went in person to the bankruptcy clerk's office in mid-December and learned that no appeal had been filed within the required 10-day period. He immediately went to Barrick, Switzer's office, and spoke with Mr. Stevens about the situation. The Debtors allege that Mr. Stevens admitted that the firm had failed to timely file the appeal. Thereafter, Barrick, Switzer filed emergency motions with the Court for leave to appeal or to reinstate the automatic stay on January 11, 2006. The Court held a hearing on January 13, 2006, and denied each motion, in large part because the 10-day period in which to appeal had lapsed.

On July 12, 2006, the Court entered an order converting the case to Chapter 7 on a

motion by the U.S. Trustee. Michael Kepler was appointed as Chapter 7 Trustee over the case

on July 14, and a Section 341 meeting of creditors was held on August 16, 2006. At some point

early in his administration of the case, the Trustee learned that the Debtors alleged that they had

a malpractice claim against Barrick, Switzer, but they had not actually filed a complaint or listed

the claim as an asset in their schedules. In July 2006, the Property had not yet been sold, and the

Trustee investigated the potential value of the Property, as well as counterclaims that the Debtors

had brought against Resource Bank in the state court proceedings that had been denied but were

on appeal at the time. The Trustee contacted a real estate appraiser in Woodstock, named Mr.

Irwin, who was familiar with the Property and the surrounding area. The Trustee had a fifteen

minute telephone conversation with Mr. Irwin on or about July 25, 2006. From the conversation,

the Trustee concluded that, because of the costs required, it would not be worthwhile to try to

develop the Property as residential real estate. He learned that the costs would be unusually high

because of the shape of the property, the distance to water, and the types of trees on the land.

From this, the Trustee concluded that, even if there were any net increase in value by developing

the land, it "would not be enough to make this property worth more than the debt against it."

(Hr'g Tr. 45, Oct. 16, 2009). On September 18, 2006, the Court granted an order on motion of

the Trustee to abandon the estate's interest in the Property and any claims, counterclaims or

causes of action against Resource Bank. A discharge order was entered on November 7, 2006.

The Trustee filed a "no asset report" on July 19, 2007, and the case was closed on August 16, 2007.

On September 28, 2007, the Debtors filed a complaint against Barrick, Switzer and Mr. Rock and Mr. Stevens, individually (collectively, the "Malpractice Defendants"), in McHenry County. The complaint alleged that the Malpractice Defendants had committed legal malpractice by failing (1) to present admissible evidence at the November 2005 Hearing to show the value of the Property exceeded the Resource Bank judgment, (2) to present evidence and arguments at the November 2005 Hearing to rebut the motion to terminate the automatic stay, (3) to conduct proper discovery, and (4) to file a timely appeal of the Court's December 5, 2005, order terminating the stay. Apparently, the Malpractice Defendants raised as a defense that the Debtors' estate rather than the Debtors were the proper plaintiffs. On March 26, 2008, the Debtors filed a motion to reopen their Chapter 7 case to add the legal malpractice claim against Barrick, Switzer as an asset. The motion was granted on May 21, 2008, and an amended Schedule B, listing the claim with a value of "unknown," was filed on June 9, 2008.

On June 25, 2008, Michael Kepler was reappointed as Trustee of the case. When the Trustee learned of the malpractice claim, his initial inclination was to abandon it because he felt that it had no merit and therefore no worth.[1] He came to this conclusion based on his belief that, even if malpractice had been committed, there were no, or only minimal, damages. In early July

---

[1] Mr. Kepler first learned of the malpractice claim when the U.S. Trustee contacted him shortly after the motion to reopen the case was filed, though he had not yet been reappointed and so was not trustee of the case at such time.

2008, the Trustee indicated to the Debtors' attorney at Konicek & Dillon that he intended to abandon the claim.

However, on July 8, 2008, the Trustee received an e-mail from the Malpractice Defendants' counsel in the malpractice litigation offering to "purchase" the malpractice claim for $7,500. The unexpected offer demonstrated that the claim had at least a settlement value, and therefore the Trustee opted not to abandon the asset. On September 5, 2008, the Trustee filed a motion under Rule 9019 to approve a compromise or settlement of the malpractice claim for $7,500. The Debtors filed an objection to the motion on November 20, 2008, alleging that the malpractice claim was worth as much as $3,000,000. Between December 2008 and February 2009, the Trustee conducted an auction process where the Debtors and the Malpractice Defendants bid on the amount they would be willing to pay to purchase or settle the malpractice claim. The Debtors initially counter-offered $8,000 to purchase the claim and the Malpractice Defendants countered with an offer of $9,000 to settle. The Debtors then raised their offer to $14,000, and the Malpractice Defendants countered by raising their an offer to $25,000. The Debtors then countered with an offer whereby they would pursue the malpractice claim and pay all costs associated with pursuing the claim, and at the end of the litigation would give the estate a guaranteed payment of $21,000 plus 1/3 of any recovery on the claim. The Trustee refused to consider the Debtors' non-cash offer, and the Debtors did not submit a revised bid higher than $25,000. The Trustee explained that one reason he refused to consider the Debtors' partially-contingent offer was that it was unfair to change the rules of the bidding process midstream. The

parties had agreed to a bidding process, and that the process was for upfront cash payments. The bidding process was not only a way to maximize the amount of recovery to the estate, but was also a method to make an independent evaluation of the value of the claim. To the extent that the payment was deferred and included contingent amounts, the value could only be assessed by evaluating the likely length of time litigation would take and the likely outcome. The other reason that the Trustee rejected the Debtors' final bid was that the Trustee thought the merits of the case had zero value. As the Trustee explained, one-third of zero is zero, and $21,000 + $0 is less than $25,000, especially when such amount might not be paid for years to come. The Court entered an order on February 23, 2009, closing the bidding process, and amending the motion to approve settlement or compromise to reflect the $25,000 bid that the Trustee received from the Malpractice Defendants. The Court held an evidentiary hearing on the motion on October 16, 2009, which was continued on November 3, 2009 (collectively, the "October 2009 Hearing").

At the October 2009 Hearing, the Trustee testified as to his evaluation of the malpractice claim, including with respect to the underlying question of the value of the Property at the time the stay was lifted and the potential to develop the Property at such time. The Debtors presented no expert testimony or appraisals as to the value of the Property or the value of the malpractice claim.[2] The Debtors' only witnesses were Mr. and Mrs. Wolff. Like at the November 2005

---

[2] Although the Debtors requested to submit an affidavit of Daniel Konicek, the Debtors' attorney-of-record in both the state malpractice litigation and in the bankruptcy case, the Court sustained the Trustee's objection that the affidavit was hearsay and contained hearsay within hearsay, and Mr. Konicek was not called as a witness at the trial.

Hearing, Mr. Wolff was not qualified to speak to the value of the Property, either as it was or as redeveloped, or to the length of time or cost it would have taken to rezone or develop the Property. The primary new information that Mr. Wolff added from his testimony in the November 2005 Hearing was that he alleged he had communications with an associate named Bill Franz about rezoning procedures, and also claimed that Mr. Franz was ready to step in and finance the entire development of the Property. Mr. Wolff stated that he was "absolutely certain that I would have been able to obtain all of the development funds and front money from William Franz," but could only support this allegation with hearsay allegations that were properly objected to. Mr. Wolff admitted that he had no binding agreement with Mr. Franz, and the story is simply too convenient to be plausible. If the Debtors truly had such a "white knight" ready to fund hundreds of thousands of dollars, it is not believable that they would make no mention of him when asked in November 2005. Also, if Mr. Franz was so interested in the plan that he was willing to invest so much money, and if the property was as undervalued as the Debtors allege, then it seems he would have bid on the property when it was in foreclosure.[3]

---

[3] After the trial, the Trustee filed a motion to reopen proofs and submit an affidavit of William Franz to rebut Mr. Wolff's statements at trial that Mr. Franz had offered his support. However, because the Court sustained the Trustee's hearsay objections at trial, and because of the minimal weight the Court places on Mr. Wolff's assertion that he "believed" Mr. Franz was willing to offer his support, the Court sees no need to reopen proofs. Therefore, the motion to reopen proofs will be denied.

## DISCUSSION

### A. The Malpractice Claim is Property of the Estate

Under 11 U.S.C. § 1107, a debtor in possession in Chapter 11 has all of the rights, powers and duties of a trustee, and can employ attorneys to represent or assist him in carrying out such duties under 11 U.S.C. § 327. The Debtors retained Barrick, Switzer while they were debtors-in-possession, and retained the firm in response to Resource Bank's motion to lift the stay. The employment of Barrick, Switzer was specifically approved by the Court pursuant to Section 327, and on a motion that expressly made reference to proposed representation in defense against Resource Bank's motion to lift the stay. All of the acts that are purported to constitute malpractice were acts taken in connection with the motion to lift the stay. If the Malpractice Defendants breached a duty as counsel, it was a duty that was owed to the Debtors' estate. See, e.g., In re Grabill Corp., 113 B.R. 966, 970 (Bankr. N.D. Ill. 1990) ("A Chapter 11 debtor-in-possession administers the assets of the estate and any business conducted therein, as a fiduciary for both the equity interests and creditors [and t]his principle of fiduciary duties and obligations carries over to the attorneys . . . who are retained for the debtor-in-possession."); In re Bellevue Place Assocs., 171 B.R. 615, 626 (Bankr. N.D. Ill. 1994). The malpractice complaint seeks only monetary damages, and the only damages asserted are related to the Property, which was property of the Debtors' estate. The asserted damages are that, because of the lifting of the stay, either the Property was sold for less than it was worth and less than the debt owed to Resource Bank, or the Debtor was unable to generate profits under a confirmable plan. In either case, the

Page 13 of 29

only damage to the Debtors individually would be the damage to their residual interest after payment to creditors in accordance with the priorities set forth in the Bankruptcy Code. Therefore, the legal malpractice claim is, and has always been, an asset of the estate. See, e.g., Bezanson v. Thomas (In re R & R Assocs. of Hampton), 402 F.3d 257, 265 (1st Cir. 2005) (finding that legal malpractice action against bankruptcy attorneys for debtor-in-possession under Chapter 11 "belonged to the bankruptcy estate" and that post-conversion trustee in Chapter 7, "as the successor to the debtor in possession and representative of the estate, plainly is entitled to pursue whatever legal claims belonged to the estate").

Even if the Debtors had retained Barrick, Switzer to represent them individually rather than as debtors-in-possession, the legal malpractice claim would still be property of the estate. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" or "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C.A. § 541(a)(1), (7) (West 2009); see also, e.g., Richman v. Garza (In re Richman), No. 96-2156, 1997 WL 360644, at *2 (4th Cir. July 1, 1997) (finding that where legal malpractice was asserted against Chapter 11 debtor-in-possession's bankruptcy counsel, even if the malpractice claim was based on injury which arose post-petition, it would still constitute property of the estate under Section 541(a)(7)).  Additionally, Section 1115(a) states that, "In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541-- (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed,

dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first." U.S.C.A. §

1115(a) (West 2009).  All events out of which the malpractice claim arose occurred post-petition

but while the case was in Chapter 11, including the retainment of Barrick, Switzer, the hearing

on the termination of the stay, the issuance of the order lifting the stay and the appeal period

during which Barrick, Switzer did not file an appeal.  Therefore, even if the malpractice claim

would have been property of the Debtors outside of bankruptcy, under Section 1115(a) it would

become property of the estate.

### B. Non-Assignment of Claims Under Illinois Law.

The Debtors argue that the proposed compromise of the malpractice claim is prohibited

by Illinois law because causes of action for legal malpractice are not assignable under Illinois

law. See, e.g., Clement v. Prestwich, 448 N.E.2d 1039, 1042 (Ill. App. Ct. 1983).[4]  However, the

proposed transaction is a settlement not a transfer.  There is nothing in Illinois law that prevents

settlements of legal malpractice claims, and in fact "[s]ettlements of contested claims are highly

favored." Barth v. Reagan, 497 N.E.2d 519, 525 (Ill. App. Ct. 1986).  The Debtors make much

of the fact that in a July 9, 2008, letter from the Malpractice Defendants' counsel to the Trustee,

the Malpractice Defendants offered "to purchase" the malpractice claim.  From this they

conclude that the transaction is a purchase or a "disguised purchase."  However, the Malpractice

---

[4] Although, as discussed above, the legal malpractice claim was property of the estate
from its inception, the restriction on assignability under Illinois law would not prevent the
automatic transfer of a legal malpractice claim from a debtor to a debtor's estate by operation of
11 U.S.C. § 541.  See, e.g., In re Hice, 223 B.R. 155, 158-59 (Bankr. N.D. Ill. 1998); In re
Haynes, No.93-72106, 1999 WL 33592904, at *6-7 (Bankr. C.D. Ill. Mar. 2, 1999).

Defendants' counsel later sent a revised letter offering to "settle and compromise" the claim, and all subsequent references were to a settlement or compromise. Furthermore, the motion submitted to the Court and which is in front of the Court is titled a "Motion to Compromise Claim Held by Estate in Exchange for Payment," and the proposed agreement is styled as such. The proposed transaction is clearly a settlement, and the Court sees no reason to look at early drafts or preliminary negotiations to recharacterize the settlement proposal as some form of disguised settlement. See Keenan v. Pyle (In re Keenan), No. 99-56640, 2002 WL 461355, at *2 (9th Cir. Feb. 27, 2002) ("Although the original agreement may have been initially couched in terms of a sale, the substance of the agreement was a settlement of the claim. The trustee has subsequently amended the agreement to make it abundantly clear that it is a settlement, not a sale, of the malpractice claim."); In re Haynes, No.93-72106, 1999 WL 33592904, at *7 (Bankr. C.D. Ill. Mar. 2, 1999) ("Throughout his pleadings, Debtor argues that such an 'assignment' is unlawful or against public policy. The Court has expressly rejected that contention, and further rejects the notion that the settlement of causes of action by the Trustee constitutes an 'assignment' at all. To some degree, it does appear that the Debtor is playing word games in his characterization of this matter as a 'settlement' versus a 'purchase', or an 'assignment' versus a 'sale'. As a court of equity concerned primarily with doing substantial justice, these meaningless distinctions are not helpful.").

Moreover, it is clear from the facts that, despite the wording used in the initial letter, the intent of the parties was always to settle the claim. Even when described as a "purchase," the

proposal was a purchase by the defendants to the claim, not by a third party, and the proposed

transaction included all of the Malpractice Defendants. The legal malpractice suit included no

cross-claims or counter-claims, and there is no allegation that one or more of the defendants was

"purchasing" the claims in order to litigate against one of the other defendants. Instead, each

defendant proposed to "purchase" his own claim. Thus, even if the transaction were styled as a

"purchase," the end result would be that, for each claim, an identical party was both plaintiff and

defendant, which as a practical matter would extinguish the case. Additionally, a "sale" to the

defendants would not raise any of the policy issues supporting Illinois' common law restriction

on assignment of legal malpractice claims. Illinois courts have stated that the policy justification

for the restriction is to avoid the "commercial aspect" of selling claims that could "debase the

legal profession" and "encourage unjustified lawsuits against members of the legal profession,

generate an increase in legal malpractice litigation, promote champerty and force attorneys to

defend themselves against strangers." Christison v. Jones, 405 N.E.2d 8 (Ill. App. Ct. 1980).

But, here, the so-called "assignment" would end litigation, not encourage litigation. There is no

suggestion that the Malpractice Defendants would attempt to litigate against themselves or

further assign the claim. An additional policy justification for the restriction is a concern for

confidentiality. The attorney-client "relationship is a confidential one which must be highly

honored and guarded by the attorney," and an assignment of a client's claim to "a stranger to the

attorney-client relationship" could endanger the "confidence reposed in [such] attorney."

Clement v. Prestwich, 448 N.E.2d 1039, 1041 (Ill. App. Ct. 1983). But there is no such danger

when the "assignee" is the attorney-defendant himself, who is no stranger to the attorney-client relationship. Accordingly, even if it were somehow possible to "sell" the legal malpractice claim to the Malpractice Defendants, it would not be prohibited by Illinois law.

The nonassignability of the claim is somewhat relevant to the auction or bidding process that the parties engaged in. Because the claim could not be sold to third parties, the bidding could not be opened to the broader market. However, Illinois law does not restrict the abandonment or transfer of a legal malpractice claim from a bankruptcy debtor's estate back to the debtor. See, e.g., Hoth v. Stogsdill, 569 N.E.2d 34, 40 (Ill. App. Ct. 1991) (trustee validly assigned malpractice claim to debtor in return for a payment of $2,500). Therefore, the bidding process among the Trustee, the Debtors and the Malpractice Defendants was proper, as neither a settlement with the Malpractice Defendants nor a sale to the Debtors would have been prevented by Illinois law. However, because the bidding was not open to others, the end result might have been limited by the Debtors' finances. Even if the claim might have been worth more, the Debtors might have bid the most that they could afford. But, the bidding process was only one element that the Trustee used in his determination of the value of the claim. As discussed below, the Trustee made an independent evaluation of the claim's worth based on the merits of the case, and the bidding process was simply an additional tool to help evaluate the amount that the Malpractice Defendants might be willing to pay to settle the case.[5]

---

[5] A similar auction process was used in a recent Nevada bankruptcy case, Suter v. Goedert, 396 B.R. 535, 547 (D. Nev. 2008).

### C. Standard for Approval of a Settlement

Under Fed. R. Bankr. P. 9019(a), the Court may approve a compromise or settlement, on motion by the trustee and after notice and a hearing, if such settlement is in the best interests of the estate. In re Doctors Hospital of Hyde Park, Inc., 474 F.3d 421, 426 (7th Cir. 2007). The "lynchpin" of the "best interests of the estate test" is "a comparison of the value of the settlement with the probable costs and benefits of litigating." Id. Among the factors that the Court should consider are "the litigation's probability of success, complexity, expense, inconvenience, and delay." Id. "The value of the settlement must be reasonably equivalent to the value of the claims surrendered," which test is met "if the settlement falls within the reasonable range of possible litigation outcomes." Id. Estimates are acceptable to support this valuation, since "no one would ever settle a case if the claim and amount of recovery could be established with 100% certainty." Id. at 430. However, a "bankruptcy court must independently evaluate the settlement, not simply accept the recommendation of the trustee." Id. at 426 (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

Here, the Trustee concluded that the malpractice claim was highly unlikely to result in a favorable decision on its merits. Based on this analysis, the lowest outcome of litigating the claim would be zero, or could actually be a loss to the estate once litigation costs were added in. The complaint that was filed in the state court sought damages "in an amount in excess of Fifty Thousand Dollars ($50,000) plus interest, including attorney's fees and costs and such further

relief as this Court may deem just and equitable in the circumstances."[6] (Debtors' Ex. 2). The

complaint alleged that, at the time the stay was terminated, the Debtors "had the ability to

reorganize and develop the property for residential homes creating value in excess of

$6,750,000." (Debtors' Ex. 2). The Debtors have alleged that the claim could result in an award

of up to $3,000,000. Thus, the range in possible outcomes appears to be between $0 and

$3,000,000.

As discussed below, because it is so unlikely that the plaintiff in the malpractice suit

could succeed on the merits, the risk-adjusted value of fully litigating the claim is close to zero.

Moreover, the Debtors have admitted that putting on a plaintiff's case could cost well above

$21,000. (Hr'g Tr. 87, Oct. 16, 2009). That is why the Trustee's first instinct was to abandon the

claim. Instead, any value to the claim is in its settlement value, or the amount that the

Malpractice Defendants would be willing to pay in order to avoid the costs of litigation. The

Court feels that the auction procedure was an effective way of estimating this value. It is true

that the bidding might have been limited by the Debtors' resources. But, even if the Trustee

were to pursue the claim, the Trustee's bargaining power to negotiate a settlement would also be

limited by the estate's resources. The Debtors have admitted that it is very expensive to put on a

plaintiff's case in a legal malpractice case.

---

[6] Under 735 Ill. Comp. Stat. 5/2-1115, "[i]n all cases, whether in tort, contract or
otherwise, in which the plaintiff seeks damages by reason of legal … malpractice, no punitive,
exemplary, vindictive or aggravated damages shall be allowed."

Accepting the proposed settlement also has the benefit of an immediate payment. The case was reopened solely to administer this asset, meaning it only needs to remain open until the claim is resolved. A settlement would allow the Trustee to immediately distribute the proceeds to creditors and cease incurring administrative costs, as well as avoid the substantial costs of litigating the claim. In contrast, litigation could drag on for years, keeping the case open for such time, and creditors would have to wait for what is ultimately likely to be a zero recovery.

### D. The Legal Malpractice Claim is Highly Unlikely to be Successful on the Merits

Under Illinois law, a plaintiff in a legal malpractice case must prove: "(1) the existence of an attorney-client relationship that established a duty on the part of [the defendant]; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause; and (4) damages." Wildey v. Paulsen, 894 N.E.2d 862, 868 (Ill. App. Ct. 2008). The Debtors have demonstrated the existence of an attorney-client relationship and have alleged negligent acts or omissions constituting a breach of that duty, such as the failure to timely file an appeal and the failure to contact or call potential witnesses or experts. But, the Trustee has presented evidence that the estate has suffered no damage that was proximately caused by any negligent acts of the Malpractice Defendants, and the Debtors have not pointed to or alleged the existence of any evidence to rebut that evidence other than unsubstantiated speculation. In order to satisfy the proximate cause aspect of a malpractice action, the plaintiff "must essentially plead and prove a 'case within a case,' meaning that the malpractice complaint is dependent on the underlying lawsuit. Thus, no malpractice exists unless the plaintiff proves that, but for the attorney's

Page 21 of 29

negligence, plaintiff would have been successful in the underlying action." <u>Fabricare Equip.</u>
<u>Credit Corp. v. Bell, Boyd & Lloyd</u>, 767 N.E.2d 470, 475 (Ill. App. Ct. 2002) (internal citations
omitted). Although the Debtors claim that the Malpractice Defendants should have found expert
witnesses to testify as to the value of the Property or the feasibility of the plan to redevelop the
Property, there is no indication that any such witnesses could have been obtained. Nor is there
any indication that an appeal of the order lifting the stay, even if timely, would have been
successful.

Additionally, under Illinois law, attorneys "are liable to their clients for damages in
malpractice actions only when they fail to exercise a reasonable degree of care and skill." <u>Barth</u>
<u>v. Reagan</u>, 564 N.E.2d 1196, 1199 (Ill. 1990). An attorney does not need to work miracles, and
is only negligent to the extent he fails to use "the skill and care ordinarily used by a reasonably
well-qualified attorney under similar circumstances." <u>See, e.g.</u>, <u>Johnson v. Halloran</u>, 728 N.E.2d
490, 494 (Ill. App. Ct. 2000). Here, the Malpractice Defendants were retained post-petition, and
only a few weeks before the hearing. Perhaps there were things that the Malpractice Defendants
could have done differently within that timeframe, but there is no indication that it would have
been material to the Court's ruling. They could have called an expert witness to testify as to the
length and cost it would have taken to rezone the Property, but this was a minor issue and would
not have proven the feasibility of the plan. They might have called as witnesses the developers
that the Debtors claim to have spoken with, but the Debtors admit that they had not entered into
any enforceable agreements with any of the developers, so the testimony would have had little

relevance. They might have called expert witnesses to present an analysis of the costs and benefits of developing the Property, but all indications are that such an analysis would demonstrate a net loss not a gain. The Malpractice Defendants could do nothing to change the characteristics of the land or to change the Debtor's actions during the six months or six years before they were retained as counsel.

### E. The Stay Would Have Been Lifted Even Absent the Negligence of the Malpractice Defendants

Under 11 U.S.C. § 362(d)(2), a request to lift the stay against property of the estate must be granted if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." The party seeking stay relief has the burden of proving a lack of equity in the property, but the debtor has the burden of demonstrating that the property is necessary to an effective reorganization. See, e.g., In re Custom Designed Cabinetry & Constr., Inc., No. 08-B-71196, 2009 WL 603807, at *3-4 (Bankr. N.D. Ill. Mar. 9, 2009) (citing United Sav. Ass'n v. Timbers of Inwood Forest, 484 U.S. 365, 375 (1988)). The Debtors had to show that there was "a reasonable possibility of a successful reorganization within a reasonable time." Id. at *4 (quoting Timbers of Inwood Forest, 484 U.S. at 375). During the first few months after filing, "the debtor is under less stringent demands to demonstrate the possibility of a successful reorganization," but even at such an early stage "the debtor is still required to present some evidence that an effective reorganization is possible." Id. at *4 (citing Timbers of Inwood Forest, 484 U.S. at 376). At a minimum, the debtor must establish "(1) [i]t is moving

Page 23 of 29

meaningfully to propose a plan of reorganization; (2) [t]he proposed or contemplated plan has a

realistic chance of being confirmed; and (3) [t]he proposed or contemplated plan is not patently

unconfirmable." Id. (internal citations omitted).

At the November 2005 Hearing, Resource Bank offered the expert witness testimony of

Mr. Renzi, who testified that the Property had a market value of $2,100,000 and that the highest

and best use of the land at the time was for agricultural use.  At the time, Resource Bank had a

claim for over $3.25 million against the Debtors secured by the Property.  The Debtors offered

no testimony at the November 2005 Hearing to rebut Mr. Renzi's appraisal value.  While it is

possible that the sole reason the Debtors failed to present such evidence was because of their

counsel's lack of diligence, it appears more likely that the Property simply was not worth more

than $2,100,000.  Even today, with new counsel, the Debtors have not offered any evidence that

the Property was worth more.  At the October 2009 hearing, the Debtors provided no new

evidence or appraisals with respect to the Property.[7]  Nor have they offered any explanation of

how a diligent attorney could have rebutted Resource Bank's evidence as to the value of the

Property.

Rather than argue as to the value of the land as it was, the Debtors argue that the land had

a great potential value.  The Debtors argue, as they argued at the November 2005 Hearing, that

---

[7] The Debtors initially indicated that they would call Mr. Renzi as a witness at the
October 16, 2009, but admitted that any testimony he would present would be consistent with his
earlier appraisal and testimony from the November 2005 Hearing.  They ultimately opted not to
call Mr. Renzi at the October 2009 Hearing.

by developing the land as residential property, they could have increased the value by over $6.5 million. It appears that the Debtors arrived at this figure based on Mr. Renzi's testimony that real estate in McHenry County that is ready for residential development could be worth more than $75,000 per acre. But, there are obvious problems with the Debtors' estimate. First, the Property was not ready for residential development, and more was required than simply having the zoning designation changed. Mr. Renzi indicated that the land lacked sufficient soil and water for residential development and would need roads and sewage lines. Trees would have had to be cut down and removed. The Debtors' estimate ignores these costs to prepare the land, which Mr. Renzi indicated would be higher than average. Second, it assumes that all or even some of the land on the Property was comparable with the $75,000/acre land. Mr. Renzi testified that the value per acre of residential land is site specific and that he had not made such an analysis for the Property. Mr. Renzi indicated that the Property had an irregular shape and limited access to the frontage road. This could affect its value as residential property. Because of the shape of the land, parts of the land would have had to be used for rights-of-way. Also, certain features of the land were likely to increase the costs of developing houses on the land. These factors made it unlikely that it would be profitable to develop the land at the time, and the Trustee came to a similar conclusion after consulting with Mr. Irwin. The Debtors have offered no specific arguments as to why Mr. Renzi or Mr. Irwin were mistaken in their assessments and have offered no evidence to support their contention that it would have been profitable at the time the stay was lifted to redevelop the Property as residential property.

Additionally, while the Debtors tried to argue that the potential value of the land was a separate question from the current value of the land, the current value should be affected by the land's potential. Mr. Renzi testified that his appraisal was based on a sale comparison basis, and indicated that he evaluated potential use when choosing comparisons. Although he was comparing the Property to other agricultural land in the area, if it were truly as profitable to redevelop land in the area as residential property as the Debtors allege, that potential would surely have affected the sale value of similar land in the area. Demand by other developers to buy farm land and redevelop it as residential property should have driven up the market price. The Debtors have given no reason why they might have been in a better position to maximize the land's potential. For example, they have not alleged that they would have been able to develop the land more cheaply than others or had resources that other developers did not. In fact, it appears to be the opposite. The Debtors have admitted that they had no experience in developing land, and would have had to have depended entirely on the experience of a potential joint venture partner.

Moreover, even if there was value in converting the land into residential property, there is no indication that the Debtors had the resources to do so. The Debtors assert that they had talked to residential developers and that such residential developers built houses worth over $500,000, but admitted that none of the developers had entered into agreements to develop such houses on the Property. When talking to developers, the Debtors were looking not only for someone who would develop the land, but a joint venture partner who would <u>fund</u> all development of the land.

Page 26 of 29

The Debtors admitted that they had less than $10,000 at the time of the motion to lift the stay, and that they had no source of financing lined up. The Debtors argue that, because of their counsel, they were unable to call developers as witnesses at the November 2005 Hearing. But, the Debtors have admitted that they had no valid agreement by anyone to finance their proposed development plans. Perhaps testimony could have shown that the Debtors were making efforts, but, without an agreement, would not have demonstrated progress or the ultimate feasibility of their plans.

The evidence presented at the November 2005 Hearing demonstrated that, prior to filing their petition, they had been living on the Property for almost six years having only made a single payment on their mortgage loan from Resource Bank and while failing to pay at least certain property taxes or insurance premiums. The evidence showed that, even though the Debtors claimed they had been taking active steps to develop the land for at least six months, they had apparently nothing to show for it -- no financing source, no partner with the ability and resources to develop the land, and not even a realistic or specific estimate of the costs or timetable to develop specific portions of the Property. These were all contributing factors to the determination that there was little likelihood that the Debtors could propose a feasible plan within a reasonable time table, and that the equities were in favor of granting Resource Bank relief from the stay. These were also events and actions that occurred well before the Malpractice Defendants were retained as counsel.

The Debtors have essentially offered no new evidence or arguments as to why the outcome of the November 2005 Hearing was incorrect, much less that the error was caused by the Malpractice Defendants' negligence. For example, at the October 2009 Hearing, the Debtors offered no expert witness testimony or appraisals to contest the value or best use of the Property. They offered no evidence that similar land had been successfully developed in the four years since the stay was lifted, or that the Property was subsequently sold for a much higher price. They offered no testimony that the Debtors had taken any real and specific steps in their proposed reorganization other than the general conversations and inquiries that Mr. Wolff testified to at the November 2005 Hearing. As such, there is no evidence that the order could have been overturned on appeal or that the outcome would have been different with different counsel. It is with some irony that, where part of the underlying malpractice claim is that the Malpractice Defendants negligently failed to present expert testimony on the value of the Property to rebut Resource Bank's evidence, the Debtors have failed to present expert testimony on the value of the malpractice claim or the value of the Property to rebut the Trustee's evidence in this motion. While the Court is ruling on the value of the malpractice claim and not ruling on the merits of the claim, the Court simply cannot see how the plaintiff could successfully demonstrate proximate cause or damages. The Debtors have not addressed this issue, and instead attack the form of the settlement, the form of the negotiation, and the steps taken by the Trustee to investigate the value of the claim. The fact that the Trustee did not contact legal malpractice specialists or spend a lot of time investigating the claim might be reasons to give less

Page 28 of 29

deference to the Trustee's evaluation of the case, but as the Debtors have stated, the Court must

make an independent evaluation of the claim.  In doing so, based on the apparent weakness of

the case on the merits, and apparent lack of evidence demonstrating damages or proximate cause,

the Court must find that $25,000 is a reasonable value to settle the claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Trustee's motion.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R.

Civ. P. 52(a) and Fed. R. Bankr. P. 7052.  A separate order shall be entered pursuant to Fed. R.

Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: January 4, 2010

The Honorable Manuel Barbosa

United States Bankruptcy Judge